**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NEW ENGLAND HEALTH CARE EMPLOYEES WELFARE FUND, and NEW ENGLAND HEALTH CARE EMPLOYEES PENSION FUND, <br><br>              Plaintiffs, <br><br>   v. <br><br> iCARE MANAGEMENT, LLC; CHELSEA PLACE CARE CENTER, LLC; TRINITY HILL CARE CENTER, LLC; WINTONBURY CARE CENTER, LLC; FARMINGTON CARE CENTER, LLC; MERIDEN CARE CENTER, LLC, a/k/a SILVER SPRINGS CARE CENTER; WESTSIDE CARE CENTER, LLC; BIDWELL CARE CENTER, LLC; and KETTLE BROOK CARE CENTER, LLC, <br><br>            Defendants. | 3:10-cv-00894 (CSH) |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS**

HAIGHT, Senior District Judge:

### I.      Introduction and Relevant Facts

In this action, plaintiffs New England Health Care Employees Welfare Fund and New England Health Care Employees Pension Fund (the "Funds") seek to collect allegedly delinquent employee benefits from Defendants, who consist of one healthcare management company and eight operators of nursing facilities (collectively the "Employers"). The Funds bring only one claim, under

1

the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1145.  The Employers and the

Funds have each filed a Motion for Summary Judgment [Docs. 65 and 69 respectively] on that claim.

In addition, the Funds have filed a Motion for Disclosure of Property and Assets [Doc. 81] and a

Motion for Modification of Prejudgment Remedy [Doc. 82].  This Ruling disposes of each of these

Motions.

The Funds are multiemployer trust funds which provide benefits to members of the New

England Health Care Employees Union, District 1199 (the "Union").  The Employers employ

members of the Union, and once each month they contribute to the Funds under the terms of two

trust agreements and various collective bargaining agreements (the "CBAs").  Three generations of

CBAs between the Employers and the Union are here at issue: (1) those entered into during 2005

("the 2005 CBAs"), (2) those entered into in September 2009 (the "2009 CBAs"), and (3) those

entered into in August 2011 (the "2011 CBAs").[1]

The fundamental issue between the parties is the interpretation of a single phrase that appears

in all of the CBAs.  Under each CBA, the amount that each Employer contributes is based on a rate

of 8% of its "gross payroll" for "[e]mployees in the bargaining unit who regularly work an average

of twenty (20) or more hours per week who have completed ninety (90) days of employment."  Each

CBA further provides that "[s]aid contributions shall be calculated in accordance with the Fund's

contribution policies which are available to all contributing employers."  *See, e.g.,* Collective

Bargaining Agreement [Doc. 70-2] § 28(C).

The question that has occupied the parties through two federal actions and three years of

---

[1]  Copies of the CBAs are attached to the Affidavit of Ellen Alch [Doc. 70] as Exhibits C-E (2011 CBAs), Exhibits J-L (2005 CBAs) and Exhibits M-O (2009 CBAs).

litigation is which employees to count in determining "gross payroll." The Funds assert that the correct interpretation of the "gross payroll" language includes all employees who were paid for working twenty hours or more per week, while the Employers assert that the correct interpretation includes only those employees who actually worked more than twenty hours per week. In other words, the parties disagree about whether to include in the calculation those employees who exceed the twenty-hour minimum only if one includes paid time off (*e.g.,* vacation, sick, and personal time).

As noted *supra*, the CBAs direct that contributions be calculated in accordance with the Funds' contribution policies. The Contributions/Collection Policies issued by the Funds' trustees for each of the Funds (the "Policies") clearly adopt the Funds' interpretation: "If the contract calls for contributions on behalf of all employees who regularly work an average of twenty (20) or more hours per week, then in a four (4) week reporting period, all employees that had at least eighty (80) *paid hours* for that period . . . must be included for payment." *See, e.g.,* New England Health Care Employees Welfare Fund Contribution/Collection Policies and Procedures [Doc. 70-5 Ex. F] § III(c) (emphasis added).[2]

The Funds' interpretation of the "gross payroll" language was the one used by the Employers until spring 2008, and used by other employers who contribute to the Funds. In November 2008, however, the Employers decided to count only employees who actually worked more than twenty hours a week regularly. They asserted, then and afterwards, that this interpretation constitutes the "plain meaning" of the "gross payroll" language. The new method of calculating gross payroll reduced the Employers' contributions to the funds by approximately $30,000 per month.

---

[2]   Copies of the Policies are attached to the Affidavit of Ellen Alch [Doc. 70] as Exhibits F-G. Under ERISA, employers must make contributions "under the terms of the plan [*e.g.,* the Policies] or under the terms of a collective bargaining agreement." 29 U.S. § 1145.

In December 2008, very soon after the Employers announced the change, the Funds filed an action in this Court challenging the new practice. *New England Health Care Emps. Welfare Fund v. iCare Mgmt., LLC,* No. 3:09CV1863 (the "Underlying Action"). The parties consented to a trial before Magistrate Judge Margolis, which was held on June 9, 2009. Judge Margolis ruled that the Funds' position is correct. *Id.*, 2009 WL 3571311 (D.Conn. Oct. 26, 2009) (the "Memorandum of Decision").[3] She held that the "gross payroll" language in the CBAs was ambiguous, but found that the past practices of both parties, the universal practice among the other employers who are parties to the same CBA, internal consistency, and the contribution policies adopted by the Trustees of the Funds establish that the Funds' interpretation is correct. *Id.* at *19-*29.

In the Memorandum of Decision, Judge Margolis instructed the Funds to file a damages analysis on or before November 13, 2009. *New England Healthcare*, 2009 WL 3571311 at *46. The Funds complied by filing a Damages Analysis and Documentation of Attorney's Fees and Costs (the "Damages Analysis").[4] Relying on that and other submissions from both parties, Judge Margolis issued a Supplemental Memorandum of Decision (the "Supplemental Decision") on January 13, 2010, making an award of damages.[5] Judge Margolis awarded the Funds a total of $295,433.74, including compensation for delinquencies in monthly contibutions, interest, liquidated damages, attorney's fees and costs. The award covered the Employers' delinquencies up to May 18, 2009, *i.e.*,

---

[3] A copy of the Memorandum of Decision is attached to the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Supp. Memo.") [Doc. 69-2] as Attachment 1. Judge Margolis also ruled in favor of the Employers on one of their counterclaims, but that aspect of her decision does not concern us here.

[4] The Damages Analysis is Doc. 47 in the Underlying Action.

[5] A copy of the Supplemental Decision constitutes Pl. Supp. Memo. Attachment 3.

up to payroll month March 2009.

In the Damages Analysis, the Funds also made a claim based on the Employers' delinquency for the payroll months from April 2009 to September 2009.  Judge Margolis, however, found their submission inadequate, because they submitted only unsworn spreadsheets, and consequently made no award for that period.  Supplemental Decision at 3.  After judgment in the Underlying Action was entered on January 19, 2010, the Funds filed a motion asking Judge Margolis to alter the judgment and grant them damages for the April-September 2009 period.[6]  She denied their motion in a ruling issued on April 5, 2010, stating that the Court "did not issue its Supplemental Decision without prejudice to the renewal of these belated submissions."  Ruling on Plaintiff's [sic.] Motion for Amended or Additional Findings (Dkt. #51) and on Defendants' Motion to Alter or Amend Judgment (Dkt. #53), dated April 5, 2010 (the "April 2010 Ruling") at 4.[7]

The Employers filed an appeal; the Funds did not.  On April 6, 2011, the Second Circuit affirmed Judge Margolis's ruling in a summary order.  *Welfare Fund, New England Health Care Emps. v. Bidwell Care Ctr., LLC.*, 419 Fed. Appx. 55 (2d Cir. 2011).  The Court, at a length and a level of detail not usually found in summary orders, quoted the 2005 CBAs' contribution provisions, recited the arguments that the parties had previously addressed to Judge Margolis, and affirmed Judge Margolis's ruling in all respects.  Although the Employers stated in earlier proceedings in the present action that they were in the process of filing a Petition for an En Banc Hearing to overturn the summary order, they instead satisfied the judgment.  *See* Defendants' Memorandum in Support

---

[6]  These events are described in more detail in Part III(C)(1) of this Ruling.

[7]  A copy of the April 2010 Ruling constitutes Doc. 55 in the Underlying Action.  The context of the

of Motion for Summary Judgment ("Def. Supp. Memo.") [Doc. 66] at 17.

On June 8, 2010, the Funds filed the present action against the Employers. They alleged that the Employers have continued to use the method of calculating gross payroll that Judge Margolis disapproved, and consequently claimed that the Employers' liability to the Funds grows with each month. Complaint ("Comp.") [Doc. 1] ¶¶ 16-21. The Funds request, *inter alia*, payment of the delinquency for the payroll months from April 2009 onwards. *Id.* ¶¶ 17-19. When the Funds filed this action, Judge Margolis had ruled in their favor but the Employers' appeal to the Second Circuit was pending. The court of appeals having affirmed Judge Margolis's ruling, the Funds now press the same theory of the case and resulting claims, with a vigor of advocacy fueled by appellate success.

Shortly after they filed the Complaint, the Funds filed a Motion for Prejudgment Remedy [Doc. 7]. This Court granted that Motion on May 2, 2011, after the Second Circuit's ruling. This Court instructed the parties to file written submissions calculating the proper damages. Ruling on Plaintiffs' Motion for Prejudgment Remedy and Defendants' Motion to Stay Proceeding ("First PJR Ruling") [Doc. 48] at 23. On June 29, 2011, the Court granted the Funds a prejudgment remedy (PJR) of $594,940.39. Ruling on Pending Motions ("Second PJR Ruling") [Doc. 57] at 8. In early October 2011, the parties filed the present Motions for Summary Judgment.

On June 27, 2012, the Funds filed the Motion for Disclosure of Property and Assets, asserting that the Employers have not satisfied the PJR and seeking disclosure of property or debts sufficient to satisfy the PJR. At the same time, they filed the Motion for Modification of Prejudgment Remedy. They assert that since the PJR was granted, the Employers' delinquency, plus interest, has increased by $486,847.40, and seek to add that amount to the PJR.

6

II.     **The Motions for Summary Judgment**

    A.     **Standard for Summary Judgment**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex* at 322-23.  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

In the present case, the parties do not disagree about facts, only about issues of law.  Thus, this case is appropriate for summary judgment.

    B.     **Overview of the Motions for Summary Judgment**

The Funds' position is simple: they won in the Underlying Action, but the Employers still refuse to contribute properly.  The Funds argue that Judge Margolis's interpretation of the "gross payroll" language is *res judicata*.  Pl. Supp. Memo. at 6-7, 13-14.  They assert, and the Employers do not deny, that from payroll month April 2009 onwards, the Employers have continued to make their monthly contributions based on their own interpretation of the "gross payroll" language.  Pl. Supp. Memo. at 2, 5.  The Funds argue that the period from April 2009 onwards is no different from the period from November 2008 to March 2009.  Since they were entitled to damages for the

delinquency for the November 2008-March 2009 period, they are also entitled to damages for the same delinquency for the period from April 2009 onwards. Pl. Supp. Memo. at 14.

The Employers argue that summary judgment should be granted in their favor against all of the Funds' claims for recovery for the period from payroll month April 2009 onwards. Def. Supp. Memo. *passim*. They divide the Funds' claims into three periods: (1) April-September 2009, when no signed CBA was in effect; (2) October 2009-August 2011, when the 2009 CBAs were in effect; and (3) September 2011-onwards, when the 2011 CBAs were (and are) in effect. *Id.* at 20. For each of these periods, they make different arguments against recovery.

The parties' briefs on the Funds' Motion for Summary Judgment make exactly the same arguments as their briefs on the Employers' Motion. Thus, the most efficient way of addressing the Motions is to consider them simultaneously. It is clear that unless the Employers are right in one or more of their arguments, summary judgment must be granted to the Funds on the basis of *res judicata*, that is, proper deference for Judge Margolis's decision, and that of the Second Circuit which affirmed it. The Court considers each of the three periods in turn.

## C.     The April-September 2009 Deliquency

The Employers make two arguments to establish that the Funds may not recover the delinquency for the payroll months from April 2009 to September 2009: (1) such recovery is precluded by the judgment in the Underlying Action, and (2) this Court lacks jurisdiction to decide a claim for a period when no signed CBA was in effect. While the Court can resolve the issue based on the first argument alone, the Court addresses both issues.

### 1.     Preclusion

The Employers argue that the Funds are precluded from recovering the delinquency for the

payroll months from April 2009 to September 2009 because that issue is *res judicata*.[8]  Def. Supp. Memo. at 21-26.  They assert that Judge Margolis's decision denying such recovery in the Underlying Action precludes any recovery for the same delinquency in the present action.[9]

As noted *supra*, Judge Margolis declined to grant recovery for the April-September 2009 period in the Supplemental Decision.  The question of preclusion can be broken down into two questions: (1) Does Judge Margolis's statement that her decision was made with prejudice in itself establish preclusion?  (2) If not, do the events in the Underlying Action establish that the issue is precluded under federal law?  Resolving the first of those two questions is relatively simple, but resolving the second is quite complex.

The simpler question is whether the matter is determined by Judge Margolis's statement in the April 2010 Ruling that the Court "did not issue its Supplemental Decision without prejudice to the renewal of these belated submissions."  April 2010 Ruling at 4.  That phrase can only be understood as stating that Judge Margolis's decision not to grant recovery for the April-September 2009 delinquency was made "with prejudice."  However, a court's statement that a decision was rendered "with prejudice" does not determine preclusive effect.  "The first court does not get to dictate to other courts the preclusion consequences of its own judgment . . ."  *Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 398 (2d Cir. 2003) (quoting 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4405 (2d

---

[8]  Because what is at issue is the preclusive effect of a federal-court judgment decided under federal law, the federal law of preclusion applies.  *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008).

[9]  This Court addressed the preclusion issue in both of its PJR Rulings, each time declining to decide it because any decision would have been premature.  First PJR Ruling at 22; Second PJR Ruling at 6.

ed. 2002)).  This is not to say that this Court gives no weight to Judge Margolis's assertion about prejudice; the comity that one court owes another enjoins respect for that assertion.  It is merely to say that her assertion about prejudice does not by itself resolve the matter.

The difficult question is whether the test for preclusion is satisfied here.  The difference between the parties comes down entirely to the question of whether the Funds had a "full and fair opportunity" to litigate the matter.  That is the decisive question whether one defines this problem as one of claim preclusion or issue preclusion (or both).[10]  "While our previous expressions of a full and fair opportunity to litigate have been in the context of collateral estoppel or issue preclusion, it is clear from what follows that invocation of res judicata or claim preclusion is subject to the same limitation."  *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481 n. 22 (1982).  The doctrine of claim preclusion "is intended to proscribe 'every matter that was offered and received to sustain or defeat a cause of action, as well as to any other matter that the parties had *a full and fair opportunity* to offer for that purpose.'"  *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 184 (2d Cir. 2011) (quoting *Manhattan Eye Ear & Throat Hosp. v. Nat'l Labor Relations Bd.*, 942 F.2d 151, 155-56 (2d Cir. 1991)) (emphasis added).  One of the four factors in the test for issue preclusion is whether there was a "full and fair opportunity for litigation in the prior proceeding."  *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d

---

[10] The Employers do not explicitly make the distinction between claim preclusion and issue preclusion, and the matter allegedly precluded could be seen as either a claim or an issue.  "The distinction between an issue and a claim is often one of degree and emphasis in applying a deeper principle that an original misadventure cannot be retrieved for a second chance."  18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 (2d ed. 2002) at 19-20.  The Funds could be said to possess a "claim" for damages for the April-September 2009 period, or the damages for that period could be viewed as one "issue" within their larger ERISA claim.  However, as noted in the text, it does not matter which form of preclusion applies, as the dispositive question in this case is the same either way.

38, 44 (2d Cir. 1986)).

The Funds have simplified the problem by resting their case against preclusion entirely on the requirement of a "full and fair opportunity" to litigate.  Pl. Supp. Memo. at 13.  They argue that they are not precluded from seeking damages for the April-September 2009 period because that matter was not actually litigated and because they did not have an adequate opportunity to litigate it.  Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp. Memo.") [Doc. 75] at 4-7; Pl. Supp. Memo. at 11-13.  The Funds explain these assertions as follows:

> The Court [Judge Margolis] refused to consider plaintiffs' post-trial damages submission covering the period April to September, 2009, based on defendants' objection that the post trial damages analysis was not submitted under oath.  Consequently, the Court never even considered evidence regarding the dollar amount of defendants' continuing delinquency for any period following the June, 2009 bench trial. . . . The plaintiffs' [sic] were only given an "adequate opportunity to litigate" the delinquency that had accrued as of the date of the trial in June, 2009; the delinquency for subsequent months was not known at the time of the bench trial [footnote omitted].  In the Supplemental Decision, the Court declined to accept plaintiffs' unsworn spreadsheets submitted after trial as proof of the monthly delinquencies that accrued between April and September, 2009.

Pl. Opp. Memo. at 5-7.

The Funds' argument that the issue was not actually litigated can easily be rejected.  Judge Margolis specifically called on the Funds to provide a damages analysis; they submitted the Damages Analysis; the Employers responded to the Damages Analysis; Judge Margolis ruled on the issue; the Funds requested reconsideration in the Motion to Alter Judgment; and Judge Margolis ruled on that request.  "[If] a question of fact is put in issue by the pleadings, and is submitted to the jury or other trier of facts for its determination, and is determined, that question of fact has been 'actually litigated.'" *Santopadre v. Pelican Homestead & Sav. Ass'n*, 937 F.2d 268, 273 (5th Cir. 1991).

The related but different question of whether the Funds had an "adequate opportunity to

litigate," on the other hand, is more difficult.  There is no exact rule defining a "full and fair opportunity" to litigate a claim or issue.  "In the end, decision [on what is a fair opportunity] will necessarily rest on the trial courts' sense of justice and equity." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971).

The Funds do not explain why the opportunity to submit the Damages Analysis was not adequate.  Pl. Opp. Memo. at 6-7; Pl. Supp. Memo. at 12-13.  However, they could argue that they should have been given a second chance to submit their evidence on the April-September 2009 delinquency when Judge Margolis rejected their first effort for failure to submit affidavits.  An attorney's error in a matter of form, they might argue, should not bar them from collecting a large sum of money to which they are substantively entitled.

That concern is a weighty one.  Thus far, including the present Ruling, five judges have held that the Funds are entitled to recovery for all the *other* months.  This makes it odd that they should be denied recovery for a six-month period that is no different from the periods for which recovery is granted, as far as the Funds' rights under the CBAs are concerned.  The judgment in the Underlying Action, upheld by the Second Circuit, established that the Funds are entitled to recover the Employers' delinquency for the payroll months from November 2008 through March 2009.  This Court, in Part III(D) and (E) of this Ruling, finds that the Funds are entitled to recovery for the payroll months from October 2009 onwards.  It seems anomalous to create a six-month "hole" in the middle of the Funds' otherwise unbroken period of recovery.

The Employers, on the other hand, have a strong argument that the Funds had a fair opportunity to litigate the issue.  "The evidence [on the April-September 2009 delinquency] was specifically solicited, offered, considered, and rejected."  Def. Supp. Memo. at 23.

12

Because the question of whether the Funds had a full and fair opportunity to litigate the delinquency depends on the sequence of relevant events in the Underlying Action, it is useful to review those events in detail here.  On October 26, 2009, Judge Margolis issued the Memorandum of Decision, finding that the Funds' interpretation of the CBAs is correct.  She did not determine the damages at that time, but instead left it as a topic for further briefing, instructing the Funds to file a current damages analysis no later than November 13, 2009.  She did, however, make a finding about the amounts of the delinquency as of May 18, 2009, and the interest due on that delinquency. Memorandum of Decision at *46.

On the due date, the Funds filed the Damages Analysis, which was severely deficient.  It provided a table listing the sums that the Funds claimed for each category of damages, including the delinquencies, liquidated damages, attorney's fees and costs.  It also included spreadsheets apparently documenting the Employers' deficiencies up through the payroll month September 2009. It did not, however, provide any affidavit or declaration attesting to the genuineness and accuracy of the spreadsheets, nor did it provide any explanation of the spreadsheets in the text of the Analysis.

On December 4, 2009, the Employers filed a Statement Regarding Plaintiffs' Untimely Post-Trial Damages Submissions, in which they argued, *inter alia*, that the Damages Analysis should be disregarded as it was based on unsworn spreadsheets that were not admissible as evidence.[11]  Twelve days later, the Funds filed a Reply to Defendants' Statement Regarding Plaintiffs' Damages Analysis.[12]  Although they addressed three of the Employers' objections to the Damages Analysis, they said nothing about the objection to the unsworn spreadsheets and did not take that opportunity

---

[11]  That Statement is Doc. 45 in the Underlying Action.

[12]  That Reply is Doc. 46 in the Underlying Action.

13

to submit affidavits.

On January 13, 2010, Judge Margolis issued the Supplemental Decision. In that Decision, she repeated her earlier finding about the delinquency, and interest thereon, as of May 18, 2009, *i.e.*, covering the period up through the payroll month March 2009. She also issued findings about the appropriate amount of liquidated damages, interest, attorney's fees and costs, and awarded the Funds $295,433.74 in total.

However, Judge Margolis declined to include in the award any amount for the April-September 2009 delinquency. "In support of these numbers, plaintiffs present to the Court unsworn spreadsheets. . . . In the absence of sworn affidavits or other substantiation of these spreadsheets, the Court will not accept this damages calculation." Supplemental Decision at 3. She did not instruct or invite the Funds to make a second attempt to document the April-September 2009 delinquency.

On January 21, 2012, the Funds filed a Motion to Alter Judgment, asking the Court to amend or make additional findings with regard to the damages due to them. As an attachment to the Memorandum filed in support of that motion, the Funds filed an affidavit from their Executive Director, Christine Pane, which attested to the accuracy of the Damages Analysis.

That motion did not find favor with Judge Margolis, who denied it in the April 2010 Ruling. She held that the Funds had not met the standard for amending a judgment under Rule 52(b) of the Federal Rules of Civil Procedure. "A Rule 52(b) motion will only be granted when the moving party can show either manifest errors of law or fact, or newly discovered evidence." April 2010 Ruling at 3, *citing United States v. Local 1804-1, Int'l Longshoreman's Ass'n*, 831 F.Supp. 167, 169 (S.D.N.Y. 1993). The Funds, she held, had not provided newly discovered evidence: "While plaintiffs have now presented an affidavit of Pane, and have now asserted that the 'delinquency

14

computation contained in plaintiff's Supplemental Damages Analysis merely updates the delinquency amounts,' and the Supplemental Damages Analysis utilizes the 'exact same methodology explained' by Pane at trial (Dkt. #51, Brief at 4), this Court did not issue its Supplemental Decision without prejudice to renewal for these belated submissions."  April 2010 Ruling at 4.  The Funds did not appeal that decision.

While the Funds certainly had an opportunity to litigate the issue, the decision was based on an incorrect form in the presentation of evidence.  In *Saylor v. Lindsley*, 391 F.2d 965 (2d Cir. 1968), the Second Circuit suggested the possibility that such a decision might not satisfy the "full and fair opportunity" requirement:

> The requirement that a judgment, to be res judicata, must be rendered 'on the merits' guarantees to every plaintiff the right once to be heard on the substance of his claim.  Thus, ordinarily, the doctrine may be invoked only after a judgment has been rendered which reaches and determines 'the real or substantial grounds of action or defense as distinguished from matters of practice, procedure, jurisdiction or form,' . . . and, at common law, a dismissal on a ground which did not resolve the substantive merit of the complaint was not a bar to a subsequent action on the same claim. . . . To this general rule, however, there are exceptions.

*Id.* at 968, quoting *Clegg v. United States*, 112 F.2d 886, 887 (10th Cir. 1940).  At this point, the reader of the *Saylor* decision hopes to be told what those exceptions are. The court, however, discussed only one exception: Rule 41(b) of the Federal Rules of Civil Procedure, which applies only to dismissals and thus is not at issue here.  On the basis of the "real or substantial grounds" principle, the court held that a shareholder was not precluded from bringing a derivative action on behalf of a corporation because another shareholder had procedurally defaulted when he brought the same claim on behalf of the same corporation in an earlier action.  *Saylor* at 968-69.  The procedural

default consisted of failure to comply with a court order to post a security bond.  *Id.* at 467.[13]

On the face of it, the court's assertion that "every plaintiff [has] the right once to be heard on the substance of his claim" seems to establish the absence of preclusion here.  The Funds' improper means of submitting evidence could be viewed as a matter of "procedure" or "form," and certainly Judge Margolis did not rule on the substance of the Funds' claim for the April-September 2009 period.  Neither the Supreme Court nor the Second Circuit has overturned *Saylor*.  However, the overwhelming trend in rulings on this subject suggests that the "substance of his claim" principle from *Saylor* should be understood and applied narrowly.

First, in *Saylor* itself other factors were present which probably influenced the court's decision, despite the broad language it used.  Technically, the first and second actions in *Saylor* were brought by the same plaintiff; they were both derivative actions brought on behalf of the same corporation.  They were brought, however, by different shareholders.  Although the court did not say so, it may have felt that the second shareholder should not have suffered such a severe consequence from the first shareholder's procedural default.  In addition, the procedural default was one that occurred at the very outset of the litigation.  "In view of the fact that the plaintiff [in the first action] was never permitted to approach the point where the court could even consider its own power to go forward to determine the merits of his substantive claim, it would be wrong to say that the dismissal

---

[13]  *Yates v. United States*, 354 U.S. 298, 335-36 (1957) holds that a party can be precluded from attempting to prove an issue that the party earlier failed to prove.  *See also Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187, 1195 (10th Cir. 2007) ("A judgment that a party has failed to carry their burden of proof may preclude that party, under the doctrine of collateral estoppel, from attempting to prove the same issue in a later adjudication.").  In those decisions, however, what was at issue was the second court's acceptance of the first court's decision on a point of fact, rather than, as here, the possibility of preclusion by an error in the form in which evidence was presented to the first court and not considered by that court because of the formal error.

in Hawkins was res judicata to the present action." *Id.* at 969 (internal punctuation omitted).  There was also some confusion about whether the first court had acted correctly in requiring the first shareholder to post the bond.  *Id.* at 969-70.

Finally, the *Saylor* court appears to have based its decision partly on the fact that the defendants had not been forced to litigate the merits of the first action.  *Id.* at 969.  In a dictum regarding Rule 41(b), the court stated that the policy behind the rule is to bar subsequent actions only in situations in which the defendant had incurred, in the first action, the inconvenience of preparing to meet the merits of the plaintiff's claim.  *Id.*  Perhaps the policy that the court found underlying Rule 41(b) represents the court's understanding of the policy underlying the *Saylor* decision as a whole.

The "real or substantial grounds" principle is not often employed by other courts, and in those cases where it *is* employed, the procedural failure of the first action occurred at the outset of the proceedings, and apparently was not the plaintiff's fault.  In one of these cases, a district court, ruling under federal law, quoted *Saylor* in finding that a plaintiff's claims were not precluded by a court's dismissal of a previous action based on an arbitration agreement.  *City of Painesville, Ohio v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 185 (N.D. Ohio 1998).  "[A] party may invoke *res judicata* only after a court has rendered a judgment that reaches and determines the real and substantial grounds of action or defense as distinguished from matters of practice, procedure, jurisdiction, or form.  Accordingly, a dismissal on a ground that did not resolve the substantive merit of the complaint is not a bar to subsequent action on the same claim."  *Id.*  Despite the court's broad statement of the principle, it may have been influenced by the fact that the dismissal occurred at the outset of the case, before the parties had spent large resources litigating it, and before the plaintiff

17

was able to make any presentation about the merits of his claim.

Another district court, ruling under Puerto Rico law, found that the dismissal of the first action based on the pendency of a prior suit did not preclude a second action arising from the same facts. *Fed. Deposit Ins. Corp. v. Ubanizadora Altomar, Inc.*, 716 F.Supp. 701, 704 (D.P.R. 1989). In that case, the first action involved the execution of a judgment on mortgage notes and the second action was an effort to foreclose the same mortgages. The causes of action were different, but the defendant asserted that the plaintiff was required to litigate both sets of claims in the same action. "The judgment [to have preclusive effect] must have reached the real and substantial grounds of the action as opposed to procedural matters. It must have assessed the relative merits of the claims asserted in the complaint." *Id.* Here again, dismissal of the first action occurred at the threshold of the case, before the plaintiff had the opportunity to present any evidence on the merits of its claim.[14]

The recent trend in caselaw suggests that *Saylor*'s rule that there is "a right once to be heard on the substance of [a] claim" is narrowly interpreted. Courts have generally found preclusion where procedural errors prevented a party from receiving consideration of the merits of the claim in the first action. The Seventh Circuit, for example, held that *res judicata* precluded a plaintiff from bringing an antitrust claim in a second action where a series of procedural errors had prevented him from obtaining a decision on the same claim in the first action. *Lim v. Cent. DuPage Hosp.*, 972 F.2d 758

---

[14] In another case, the Court of Veterans' Appeals found that a ruling that an administrative body had not supplied "adequate reasons or bases" for a determination did not reach the "real and substantial grounds" of the matter and thus lacked preclusive effect. *Winslow v. Brown*, 8 Vet. App. 469, 472 (1996). In that case, however, what was at issue was not a procedural problem in the first action but the nature of the ruling in the first action. The district court in *Wilson v. Fullwood*, 772 F.Supp.2d 246, 261 (D.D.C. 2011) also cited the "real or substantial grounds" principle from *Saylor*, but it is not clear what role, if any, that principle played in the court's decision that some claims and issues were precluded while others were not.

(7th Cir. 1992).  The primary procedural error was the failure of the plaintiff's attorney to request, at oral argument on appeal in the first action, a remand that would have enabled him to reinstate his then-withdrawn antitrust claim.  *Id.* at 761.  "The plaintiff failed to take advantage of his full and fair opportunity to litigate the antitrust claims . . . The requirement that a party have a full and fair opportunity to litigate an issue before *res judicata* may apply relates to the procedural opportunity rather than to a judicial determination of the merits of the issue."  *Id.* at 763.

In cases like this one, in which the alleged lack of a full and fair opportunity to litigate the first action was based on an inadequate presentation of evidence, courts have found preclusion.  For example, the Third Circuit held that a plaintiff was precluded from raising an issue in a second action where the plaintiff alleged that his attorney's failure to discover and present readily available evidence had caused his defeat on that issue in the first action.  *Braen v. Laganella*, 900 F.2d 621 (10th Cir. 1990).  According to the plaintiff, his attorney acted negligently by failing to examine important documents and to make potentially helpful arguments at trial, thus causing him to lose on the issue of whether he had acted with malice in prosecuting a criminal complaint.  *Id.* at 628.  The court held that the fact that the attorney did not "put forward all there was to tender" did not defeat issue preclusion.  *Id.* at 629.  "The only cases we have found in which a lawyer's defalcation has been held to warrant relief from the consequences of a judgment are cases in which the client was deprived of his day in court because his lawyer failed altogether to respond to a motion for default judgment or a motion for summary judgment. . . . Braen clearly had a full and fair opportunity to litigate his case.  The trial lasted for two weeks, and his attorney mounted a substantial defense."  *Id.*

A court within this circuit found issue preclusion in a similar situation.  *Index Fund, Inc. v.*

19

*Hagopian*, 677 F.Supp. 710, 717 (S.D.N.Y. 1987). The plaintiff filed two actions, one against its insurer and one against Hagopian, its former president, both based on allegations that Hagopian had defrauded it through market manipulation.  After a trial in the first action (against the insurer), at which Hagopian did not testify, the jury found in the plaintiff's favor on only one of its claims.  In the second action (against Hagopian), the plaintiff sought to raise issues on which it had been defeated in the first action. The plaintiff asserted that it had not been given a full and fair opportunity to litigate the issue in the first action, because Hagopian did not testify in that action.  "The court rejects that argument because to defeat issue preclusion on this ground, plaintiff must not have been responsible in any way for the absence of the evidence from the initial trial."  *Id.*  The court found that the plaintiff could have taken steps to obtain Hagopian's testimony through depositions, but failed to do so.  *Id.*

A district court, applying Washington law, held that a ruling based on a procedural error had preclusive effect in a case similar to this one.  *Ballard Condo. Owners Ass'n*, No. C09-00484, 2010 WL 4683721 (W.D. Wash. Nov. 12, 2010).  The trial and appeals courts in the first action had declined to consider an expert report submitted by the plaintiff because the report was not attached to the declaration of the person who wrote it, but to a declaration filed by counsel.  *Id.* at *3 n. 4. In the second action, the plaintiff claimed that he was not precluded from raising the issue in question because, *inter alia*, the judgment in the first action was based on his failure to comply with a procedural requirement, rather than being based on the substantive merits of the claim.  *Id.* at *3-*4.  The court held that the issue was precluded.  "The concept of injustice does not apply simply because plaintiff would like to reargue the issue in a case where counsel's procedural error resulted in an adverse ruling. . . . Plaintiff had a full and fair opportunity to litigate the issue . . . and counsel's

20

procedural errors do not work to create an injustice." *Id.* at *4.  *See also In the Matter of Victor Distrib. Co.*, 11 B.R. 242, 246 n. 3 (Bankr. E.D. Va. 1981) ("It is sufficient that the status of the suit is such that the parties might have had their suit disposed of on the merits if they had presented all their evidence, and the court had properly understood the facts, and correctly applied the law to the facts.").[15]

A district court in this circuit found that an issue was not precluded where the plaintiff had been denied a fair opportunity to litigate by serious misconduct on the part of his attorney. *Tufamerica, Inc. v. Hammond*, No. 99 Civ. 10369, 2002 WL 1058059, at *8-*10 (S.D.N.Y. May 23, 2002).  That decision, however, was issued in the context of *nonmutual* issue preclusion.  In the first action, the plaintiff alleged that a set of defendants had illegally copied drumtracks from a song named "Impeach the President," for which the plaintiff claimed to own copyrights.  That action was characterized by substantial misconduct by the plaintiff's attorney, which included ceasing to represent the plaintiff in the midst of litigation while refusing to return legal files to it and disregarding important evidence provided to him by the plaintiff.  *Id.* at *2.  The court in the first action, granting summary judgment to the defendants, held that the plaintiff did not own any copyrights to "Impeach the President."  The plaintiff later filed the second action against another set of defendants, claiming that their songs contained infringing samples of "Impeach the President."

The court in the second action held that the plaintiff had not received, in the first action, a "full and fair opportunity" to litigate the issue of its ownership of copyrights in "Impeach the

---

[15] In *Chien v. Skystar Bio Pharm. Co.*, 623 F.Supp.2d 255, 261 (D.Conn. 2009), this Court held that a former counsel's alleged omissions in presentation of evidence did not provide an exception to *res judicata*.  In that case, the preclusion issue was decided primarily on other grounds.

President." *Id.* at *9.  The fact that the plaintiff (represented by new counsel) had failed to file a motion for relief from the judgment under Rule 60 of the Federal Rules of Civil Procedure, and that it had failed to appeal the summary judgment decision, did not restore to it a "full and fair opportunity" to litigate the issue. *Id.* at *10.  However, the court stressed that this was a matter of nonmutual preclusion.  The defendants in the first action had fully litigated the issue of the plaintiff's copyright ownership, but the defendants in the second action had not. *Id.*  The court thus left open the possibility that the plaintiff would have been precluded if he had sought to claim ownership of the copyrights in an action against the original defendants.  Also, the court observed that "the circumstances of this case . . . rise above misconduct or incompetence." *Id.* at *9.

On the basis of the foregoing authority, this Court must proceed cautiously in denying preclusion based on counsel's error in the Underlying Action.  Despite the broad language used in *Saylor* and some other opinions, the courts are necessarily reluctant to allow relitigation of claims where the procedural error was the plaintiff's, the matter was decided after the defendant spent resources litigating it, and the plaintiff had not been entirely barred from presenting evidence on the merits.

Two additional factors weigh heavily in favor of preclusion here.  The first of these is the Funds' unexplained failure to appeal Judge Margolis's decision.  While the courts have not held that failure to appeal always waives an argument that the party lacked a full and fair opportunity to litigate an issue for preclusion purposes, an unexplained failure to appeal certainly militates against such an argument.

The Second Circuit, for example, rejecting a plaintiff's argument that he had been denied a full and fair opportunity to litigate an issue, cited the fact that he failed to appeal. *Grieve v. Temerin*,

22

269 F.3d 149, 154 (2d Cir. 2001).  The court in the first federal action dismissed the plaintiff's complaint on the basis of *Younger* abstention in favor of a pending state court action, and the plaintiff did not appeal that ruling.  The plaintiff sought to challenge the propriety of *Younger* abstention in the second federal action, asserting that the first district judge had, in an informal colloquy, told him that his only opportunity for relief lay in the second federal action (he was *pro se* in the first federal action).  The Second Circuit ruled as follows:

> Assuming it was said, however, the fact that the [first court], in addition to making an erroneous ruling, also made an erroneous observation in colloquy does not relieve [the plaintiff] from his failure to appeal its ruling.  If [the plaintiff] wished to contend that the district court was wrong, his remedy was to appeal. When he failed to do so, the Southern District's decision became final and, by operation of collateral estoppel, conclusive on the issue of *Younger* abstention in the [second] action also.

*Id*.

In *Grieve*, the Second Circuit did not make it clear whether the failure to appeal was itself enough to justify preclusion.  Nevertheless, its statement that the plaintiff's remedy was to appeal the first court's decision does suggest a policy against permitting an issue to be relitigated when the party that lost in the first action failed to appeal on that issue.

Other courts have found that failure to appeal forecloses an argument that the party lacked a full and fair opportunity to litigate.  The Seventh Circuit held so explicitly in *Lim v. Central DuPage Hospital*, 972 F.2d 758, 764 (7th Cir. 1992).  After judgment was entered against the plaintiff in that action, he filed a motion under Federal Rule of Civil Procedure 60(b)(6) requesting that the judgment be vacated.  When the district court denied that motion, he filed an appeal of that decision, but he failed to submit an appellate brief, and consequently his appeal was dismissed. When he sought to bring new claims based on the same facts in a second action, the action was

dismissed as *res judicata*.  "In defaulting on his Rule 60(b)(6) appeal, the plaintiff failed to pursue the 'full and fair opportunity' to litigate his available antitrust claim. . . . [The plaintiff's] inability to litigate his antitrust claim is the result not of a deprivation of available process, but of his counsel's failure to follow through with the full and fair opportunity that was available to him." *Id.*

The Tenth Circuit apparently took the same position, although less clearly, in *Wilson v. Bustamante*, No. 95-2028, 1995 WL 538957 (10th Cir. Sept. 1, 1995).  The plaintiff filed multiple civil rights actions in federal court based on the same search and seizure.  After the first action was dismissed on the grounds that the plaintiff had waived the claim by pleading guilty to the relevant criminal charge, the plaintiff failed to appeal the dismissal order.  The Court of Appeals held that the second action was precluded.  "The bottom line . . . is that Mr. Wilson had a full and fair opportunity to litigate his search and seizure issue in the first civil rights action, and he did not appeal from the holding there that the claim was waived." *Id.* at *1.  In that case, the failure to appeal seems to have underscored the fact that he had received a full and fair opportunity to litigate.

A district court likewise held that failure to file an appeal established a full and fair opportunity to litigate an issue under New York preclusion law. *LaManna v. Concord Mortg. Corp.*, No. 1:05-CV-0781, 2008 WL 207794, at *2 (N.D.N.Y. Jan. 23, 2008).  The plaintiff in that case sought to rescind a mortgage.  A New York state court held that she did not have the right of rescission, and she did not appeal that decision.  When she sought the same relief in a federal action, the district court dismissed the action because the state court's resolution of the issue precluded it.  "Plaintiff had an opportunity to file an appeal, but, apparently, did not do so.  Accordingly, Plaintiff had a full and fair opportunity to litigate the issue." *Id.*  Taken together, these decisions suggest that a failure to appeal generally establishes a full and fair opportunity to litigate when the failure is not

explained.[16]

The second factor weighing in favor of preclusion is the multiple opportunities that the Funds had to present sworn statements in their Damages Analysis.  First, Judge Margolis gave the Funds over two weeks to prepare their Damages Analysis when she issued the Memorandum of Decision, and altogether they had five months from the trial to the November 13 deadline to do so.  They should not have been surprised to discover that they were expected to provide sworn evidence to support their claim for the April-September 2009 delinquency; they had already presented sworn evidence for the earlier delinquency.

Additionally, and as noted *supra*, three weeks after the Funds filed the Damages Analysis, the Employers filed their Statement objecting to it.  Among the issues they raised in that Statement (at Paragraphs 6 and 8(a)) was the absence of affidavits to support the spreadsheets.  The Employers thus drew the Funds' attention to the lack of sworn evidence for the April-September 2009 delinquency.  At that point, the Funds had an excellent opportunity to correct their mistake by submitting one or more affidavits.  However, their Reply to the Employers' Statement never mentioned the issue of the unsworn spreadsheets, responding to each of the Employers' objections to the Damages Analysis *except* that one.  It was only on January 13, 2012, almost a month after the Funds submitted their Reply, that Judge Margolis issued the Supplemental Decision.  Although Judge Margolis did not give the Funds another chance to submit the appropriate evidence after she

---

[16]  The court in *Tufamerica v. Hammond*, No. 99 Civ. 10369, 2002 WL 1058059 (S.D.N.Y. May 23, 2002) held that failure to appeal did not justify preclusion, but in that case the court held that an appeal would probably not have given the plaintiff any remedy, since he probably could not have presented evidence that his attorney had failed to offer.  *Id.* at *10. Here, on the other hand, the Funds could have appealed Judge Margolis's denial of their Rule 52 motion, presenting a question of law.  If the Second Circuit had ruled in their favor and remanded the matter, the Funds could then have submitted their evidence and affidavits.

issued the Supplemental Decision, they had already had multiple opportunities to do so.

Despite the oddity of creating a six-month "hole" in the Funds' recovery, the events in the Underlying Action show that the Funds had a full and fair opportunity to litigate that matter and failed to do so.  Under federal law, they are precluded from raising it again.

### 2.    Jurisdiction

While this preclusion holding is dispositive of the issue of the April-September 2009 delinquency, the Court here addresses the Employers' second argument for denying recovery for the April-September 2009 period, in the event that the Second Circuit should take a different view.  The Employers argue that this Court lacks jurisdiction to impose liability for that delinquency because no CBA was in effect during those months.  Def. Supp. Memo. at 26-29.  The Court disagrees.

The parties are in agreement that no CBAs were in effect for the payroll months from April to September 2009.  Def. Supp. Memo. at 26; Pl. Supp. Memo. at 10-11.  The 2005 CBAs expired in March 2009.  The 2009 CBAs came into effect in September 2009.  Hence the payroll-contribution deficiency corresponds to the gap period when no CBAs were operative.

The Employers' argument is based on the Supreme Court's holding in *Laborers Health & Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539 (1988).  According to the Employers, the Supreme Court held that "federal courts lack jurisdiction over an ERISA claim to collect alleged delinquent fund contributions for periods that occur after the expiration of a CBA and before any CBA becomes effective."  Def. Supp. Memo. at 26.  *Advanced Lightweight*, however, does not stand for that proposition.  The Supreme Court's holding applied only to jurisdiction over NLRA claims.

In *Advanced Lightweight*, the Court drew a clear distinction between two kinds of legal duties

that an employer may have to contribute to a pension fund: (1) contractual duties, and (2) statutory

duties under the National Labor Relations Act (NLRA), 29 U.S.C. § 151, *et seq.*  The first sentence

of the opinion states that "[a] company that is a party to a collective-bargaining agreement may have

a contractual duty to make contributions to a pension fund during the term of the agreement and, in

addition, may have a duty under the National Labor Relations Act (NLRA) to continue making such

contributions after the expiration of the contract and while negotiations for a new contract are in

process."  *Advanced Lightweight* at 541.  The Court held that ERISA "does not confer jurisdiction

on district courts to determine whether an employer's unilateral decision to refuse to make

postcontract contributions *constitutes a violation of the NLRA*."  *Advanced Lightweight* at 549

(emphasis added).  Nothing in *Advanced Lightweight* restricts a court's jurisdiction to enforce

*contractual* duties.

Although the Funds did not explain the legal basis for this claim in their Verified Complaint,

in their briefing they established that they claim the right to the contributions for the April-September

2009 period not under the NLRA, but as a contractual right created by the Employers' intent to be

bound by unsigned CBAs.  Pl. Opp. Memo. at 11-12.  As they observe, the Second Circuit has

established that pension and welfare funds have a contractual cause of action based on unsigned

CBAs.  *Brown v. C. Volante Corp.*, 194 F.3d 351 (2d Cir. 1999).

In *Brown*, the defendant employer was a signatory to CBAs in effect from 1987 to 1990, but

did not sign CBAs covering the period from 1990 to 1996.  Nevertheless, it continued to make

contributions to the plaintiff pension fund using the rates in the standard industry CBAs.  In that

case, as here, the parties differed about the correct way of counting the employees for whom

contributions should be made.  The plaintiff sued under ERISA.  The Second Circuit upheld a grant

of summary judgment to the plaintiff.

The court began by interpreting *Advanced Lightweight* as "stand[ing] only for the unremarkable proposition that only the National Labor Relations Board has exclusive jurisdiction over unfair labor practice claims." *Brown* at 354.  It observed that the plaintiff was not claiming an unfair labor practice, but rather suing under the terms of the unsigned CBAs.  It thus found no lack of jurisdiction.  *Id.*  It held that the plaintiff had presented enough evidence to establish the defendant's intent to adopt the two unsigned CBAs, specifically sixty-one remittance reports, the defendant's cooperation with an audit, its payment of union wages to employees, and a letter from the defendant's president to the plaintiff acknowledging the defendant's "responsibility to the funds." *Id.* at 355.  It further held that the unsigned CBAs satisfied the requirement under the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5)(B), that payments to a trust fund be made pursuant to a "written trust agreement with the employer."  As long as a CBA is written and sets forth a detailed basis for payments, it need not be signed.

The factors that a court will look to in determining whether an employer adopted an unsigned CBA include payment of the wages on the union scale, paying pension and welfare contributions, submission of benefit reports, and accession to union audits.  *Id.* (citing *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) and *Trustees of Atlanta Iron Workers, Local 387 Pension Fund v. S. Stress Wire Corp.*, 724 F.2d 1458, 1459-60 (11th Cir. 1983)).  In the present case, the Employers continued uninterrupted payment of monthly contributions to the Funds throughout the period when no signed CBA was in effect.  That practice constitutes evidence that the Employers intended to be bound by the unsigned CBAs.  They have presented no evidence on any of the other factors to counterbalance that evidence.  Therefore, the Court finds that the Employers are bound by the unsigned CBAs for

28

the April-September 2009 period.

Nevertheless, for the reasons stated in Part II(C)(1), the Court grants summary judgment in favor of the Employers with respect to the April-September 2009 delinquency, because recovery for that period is barred by *res judicata.*

### D.    The October 2009-August 2011 Delinquency

The Employers make an unusual argument about the October 2009-August 2011 delinquency (the period covered by the 2009 CBAs).  They argue that they are not liable for that delinquency because the "gross payroll" language in the 2009 CBAs must be interpreted as incorporating the Employers' interpretation, even though the courts have decided that the Funds' position on that issue represents the correct interpretation of the identical language in the 2005 CBAs.  Def. Supp. Memo. at 30-34.

The 2009 CBAs were signed in September 2009, shortly before Judge Margolis issued the Memorandum of Decision on October 26, 2009.  They contained contribution language that was "identical in all material respects to the language in the 2005 CBAs."  Def. Supp. Memo. at 30.

The Employers base their argument on Judge Margolis's finding that the contribution language at issue is ambiguous, which was the basis for her use of extrinsic evidence.  Judge Margolis found that "the basic fact that there are two reasonable interpretations of the language's 'plain meaning' proffered evidenced inherent ambiguity in the language." Memorandum of Decision at *24.  According to the Employers, "her decision established that the relevant language shall forever be ambiguous . . . ."  Def. Supp. Memo. at 31.  Because the "gross payroll" language is ambiguous, the Employers say, they did not "assent" to the Funds' interpretation of it when the 2009 CBAs were negotiated in September 2009.  *Id.* at 31-32.  The Employers do not explain how, in that

29

case, the Funds "assented" to the Employers' interpretation.

The Employers moreover believe that the reach of Judge Margolis's decision was limited to the 2005 CBAs.  "The fact that Judge Margolis interpreted the ambiguous CBA language in favor of the Funds using extrinsic evidence under the 2005 CBAs did not transform the ambiguous language into unambiguous language . . . ."  Def. Supp. Memo. at 31.  Although the Employers' argument on this point is not clear, it seems that they are asserting that the extrinsic evidence that Judge Margolis applied in her decision was evidence only about the adoption of the 2005 CBAs.  If the Employers are right, it would be necessary to discover and apply new extrinsic evidence to each readoption of the CBAs, operating on the assumption that the parties may in each readoption have had a different intent than in their previous readoption of the same language.

However, Judge Margolis's decision cannot bear that interpretation.  Her findings were in no way limited to the 2005 CBAs; indeed, no facts specific to the 2005 CBAs (as opposed to the 2009 CBAs) are even mentioned in the Memorandum of Decision.

Instead, Judge Margolis straightforwardly and clearly rejected the idea that the Funds' and the Employers' interpretations of the "gross payroll" language are equally reasonable.  She found that the Employers' preferred interpretation "reveals inconsistent interpretations of the term 'work' for the purpose of employer contributions, in that when an employee falls below the 20 hour exclusion, the term 'work' only means hours on a job site, while for the purpose of calculating gross payroll, 'work' includes all hours paid."  Memorandum of Decision at *28.  She found that the Funds' intepretation, which was adopted by the Trustees in the Policies and therefore is entitled to deference, is entirely reasonable: "Conversely, the long-standing contribution method of all involved parties, and of all other contributing employers to plaintiff Funds [the Funds' interpretation] . . .

represents a reasonable interpretation of *the plain language* of the contribution policy, and as such, judicial deference to such policy is required by ERISA." *Id.* (emphasis added).   In short, Judge Margolis found, and the Second Circuit affirmed, that the Funds' interpretation of the "gross payroll" language is correct. *See New England Healthcare Emp. Welfare Fund v. iCare Mgmt., LLC.*, 419 Fed. Appx. 55, 57 (2d Cir. 2011) ("[T]he plain language of the contribution policies, specifically referenced in the CBAs, includes all paid hours in calculating the twenty-hour minimum.").

None of the reasons Judge Margolis gave for her decision was specific to the 2005 CBAs. She observed that the Policies adopted by the Trustees of the Funds (who include management and labor representatives) specifically endorsed the Funds' interpretation. *Id.* at *21-*22.   She found that there is no inherent conflict between the plain text of the CBAs and that of the Policies, thus "bring[ing] the analysis back to the [Policies'] explanation" because of the deference owed to the Trustees' interpretation. *Id.* at *23.   She found that the Funds' interpretation represents the past practice of all involved parties, including the Employers. *Id.* at *25-*26.   She stated that of fifty employers that contribute to the Welfare Fund and eighty employers that contribute to the Pension Fund, all but the present defendants have adopted the Funds' interpretation. *Id.* at *29.   Judge Margolis referred to the fact that "bargaining history" is sometimes used to interpret contracts, *id.* at *25, but did not address the bargaining history of the 2005 CBAs in her decision.   She was justified in doing so; the rule is that when a court finds a provision ambiguous, it *may* look to bargaining history, not that it *must* do so. *See, e.g., Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000).

All of Judge Margolis's arguments in favor of the Funds' interpretation apply as much to the

2009 CBAs as to the 2005 CBAs.  There is no need to consider new extrinsic evidence regarding the intent of the parties in entering into each new adoption of the CBAs.

The Employers' argument that they did not "assent" to the court's interpretation of the "gross payroll" language in the 2009 CBAs proves too much.  They could argue with equal force that they did not "assent" to Judge Margolis's interpretation when they signed the 2005 CBAs.  In that case, Judge Margolis's decision was fruitless, as was the Second Circuit's decision affirming it, because it could not apply to *any* existing CBAs.

If the Employers' theory of "assent" is correct, the interpretation adopted by the courts of any language found to be ambiguous would not apply to any existing contract, unless additional evidence is provided showing that the parties "assented" to that interpretation.  That idea, if adopted, would represent a revolution in contract law.  The Employers offer no authority to support that idea; instead, their authority merely supports the general concept of a "meeting of the minds" in contract law.  Def. Supp. Memo. at 32-33.

The Court cannot adopt the Employers' revolutionary, not to say eccentric, approach to contract law.  It is clear that Judge Margolis's decision in the Underlying Action applies as much to the 2009 as the 2005 CBAs.  In this case, it is the Funds' position that is *res judicata*.  Summary judgment is granted in favor of the Funds with respect to the October 2009-August 2011 delinquency.[17]

---

[17]   The Employers, despite the unusual nature of their "assent" approach and failure to cite any authority genuinely relevant to their arguments on the topic, refer to the Funds' arguments as "nonsensical" and "bizarre" and assert that they "do not provide any legal support" for them. Defendants' Reply to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment [Doc. 80] at 3-4.  The Funds, who also generally eschew case citations, say that the Employers make their arguments "stubbornly" and "brazenly."  Plaintiffs' Reply to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment

**E.      The Delinquency for the Period Starting in September 2011**

The Employers, having blazed new but uninhabitable ground in their argument about the delinquency under the 2009 CBAs, continue their trek into the legal wilderness in their argument about the delinquency under the 2011 CBAs.   Again they proceed without the benefit of legal authority, failing to employ a single case citation in this section of their briefs.   Def. Supp. Memo. at 34-36; Def. Opp. Memo. at 30-32.

In August 2011, the parties signed the 2011 CBAs, governing contributions for the period starting with payroll month September 2011.   By that time, the Second Circuit had affirmed Judge Margolis's reading of the "gross payroll" language.  *Welfare Fund, New England Health Care Emps. v. Bidwell Care Center, LLC*, 419 Fed. Appx. 55, 59 (2d Cir. 2011).   The parties adopted the same "gross payroll" language in those CBAs as in the previous CBAs.

The Employers' novel argument is that they unilaterally determined the meaning of the "gross payroll" language in the 2011 CBAs, giving it a different meaning from the one it had in the 2005 CBAs, by publicly stating their intent.   They point to a statement made in a document filed in the present action, specifically Defendants' Reply to Plaintiffs' Supplemental Submission Regarding Calculation of Prejudgment Remedy (the "May 2011 Reply") [Doc. 54].   In that document, they stated that "it is the Employers' specific intent to contribute to the Funds in the same manner that they have contributed since November 2008 – i.e., 'work' means 'work,' *not* 'are paid.'   Furthermore, if the Employers agree to any new CBAs that contain ambiguous language regarding Fund contributions, it is still the Employers' specific intent to contribute to the Funds in the same manner

---

[Doc. 79] at 4.   Accusations of this kind can be found throughout the parties' briefs.   Both parties seem to believe (wrongly) that the Court is persuaded by harsh language rather than legal authority.

that they have contributed since November 2008." May 2011 Reply at 8 (bolding and underlining omitted).  Consequently, the Employers assert, the "gross payroll" language in the 2011 CBAs bears a new meaning conferred on it by that statement.  The Employers do not assert that the parties signed any supplemental document adopting their interpretation of that language.

The Employers do not cite, and the Court has not found, any authority even suggesting, let alone supporting, the proposition that the Employers may unilaterally determine the interpretation of a CBA by a statement made in a document that they filed in litigation to determine that very issue. The statement in the May 2011 Reply is at most one piece of extrinsic evidence about the intent of one party in adopting the same "gross payroll" language in the 2011 CBAs that the parties had adopted in prior CBAs.

Indeed, it is not clear that the Court can consider this unilateral Employers' statement as evidence of the parties' intent.  The categories of extrinsic evidence that a court may consider in interpreting an ambiguous provision of a CBA include bargaining history, past practices, industry practices, other provisions in the CBA, and legal context.  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 131-32 (2d Cir. 2005).  The Tenth Circuit adds that courts may consider the structure of the agreement, the "common law of the shop," and the parties' conduct reflecting their understanding of the agreement. *Aguilar v. Basin Res., Inc.*, 47 Fed. Appx. 872, 875-76 (10th Cir. 2002).  Unilateral statements of intent have not been mentioned as potential extrinsic evidence.

The Funds, on other hand, argue that when the 2011 CBAs were adopted, the "gross payroll" language had already been given a construction by the courts, and "the Employers' [sic.] knew, or should have known, exactly the terms that they were agreeing to when they once again, as they had for numerous CBAs over the years, agreed to the identical, standard contribution language."  Pl.

Supp. Memo. at 10-11; Pl. Opp. Memo. at 17.  This argument is more persuasive.  The parties were all aware that the courts had given that language a specific interpretation, which was based on the Policies, past practices, internal consistency, and the practice of other employers, rather than on bargaining history.

When parties adopt language that a court has interpreted in a later contract without change, there is an implication that they intended to incorporate the court's interpretation into the later contract.  The Supreme Court, for example, interpreted two CBAs in the coal industry partly by relying on past court interpretations of the same language in earlier adoptions of essentially the same CBA.  *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 222 (1979).

In *Carbon Fuel*, the union and the employer had been parties to a series of CBAs known as the Bituminous Coal Wage Agreements (BCWAs).  The BCWAs at issue in *Carbon Fuel* had been adopted in 1968 and 1971.  The employer argued that the union was liable in connection with wildcat strikes that occurred between 1969 and 1973.  One of the employer's arguments was that the union was liable under the "integrity clause" of the BCWAs, under which both parties affirmed their intention to prevent stoppages of work pending adjudication of disputes under the BCWA.  The Supreme Court rejected that interpretation of the "integrity clause," partly because the first BCWA contained an explicit no-strike clause which was deleted in 1947.  However, the Court also rested its interpretation of the integrity clause on the interpretations courts had given to the 1950-52 BCWA:

> [T]wo Courts of Appeal construed this contract as not imposing liability on the union for wildcat strikes and as not requiring UMWA [the union] to take any action with regard to such strikes. . . . If these interpretations do not accord with the parties' understanding of their contract, they had ample opportunity to make their own understanding explicit.  Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreements.

35

*Id.* The Court excluded from consideration two court interpretations of the integrity clause that had been issued only after the parties entered into the present BCWA. *Id.* n. 10.

The Sixth Circuit adopted the same approach in *International Union, United Mine Workers of America v. Apogee Coal Co.*, 330 F.3d 740, 747 (6th Cir. 2003). This action again involved the BCWAs. In this case, the question was the interpretation of a "successorship clause" in the 1998 BCWA under which each employer had undertaken not to transfer its operations to a successor without obtaining the successor's agreement to assume its obligations under the BCWA. The court adopted the employers' interpretation of the word "operations" as it appeared in the 1998 clause by referring to interpretations of the word "operations" in earlier BCWAs handed down by the courts before 1998. "Here, the fact that the language of the successorship clause has remained unchanged since 1974 is compelling evidence that prior courts' determinations . . . [were] consistent with the intent of the parties." *Id.*

Other courts have also taken the readoption of CBA language to which courts had given an interpretation as evidencing intent to adopt the court's interpretation. *Aguilar v. Basin Res., Inc.*, 47 Fed. Appx. 872, 880 (10th Cir. 2002) (retention of language previously interpreted by the courts indicated that the parties incorporated the courts' interpretation); *Galgay v. Gil-Pre Corp.*, 864 F.2d 1018, 1023 (3rd Cir. 1988) (fact that parties to a CBA readopted phrase that had been clearly interpreted by a district court suggests that they adopted the court's interpretation of the phrase); *Combs v. Maben Energy Corp.*, 637 F.Supp. 954, 958 (S.D.W.Va. 1986) ("Continued use of the same terms after judicial construction implies the acceptance of the courts' interpretation.").

If the Employers, after the decision in the Underlying Action had been handed down, wished to adopt a different method of calculating contributions, their recourse was to re-negotiate the CBA

before signing the 2011 version.  If the matter was important enough to the Employers to justify such effort, they could have insisted on changes to the "gross payroll" language.  Instead, they acceded to the existing language.

The Employers ask the Court to endorse an odd state of affairs in which their contributions from September 2011 onwards would be smaller than their contributions through August 2011, despite unchanged contract language.  The Court declines to do so.  Summary judgment is granted to the Funds with respect to the delinquency for the period beginning on payroll month September 2011.

III.    **Damages**

The Funds request three categories of damages.  Each of these categories is provided for in ERISA and was awarded to the Funds for the earlier period in the Underlying Action.  The relevant passage in ERISA reads as follows:

> In any action under this subchapter by a fiduciary or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan–
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of–
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).  The Funds request, and are entitled to receive, the damages available under subsections (A) through (D).

37

The Funds have submitted sworn spreadsheets covering delinquencies for the period up to payroll month August 2011.  Affidavit of Ellen Alch [Doc. 70] ¶ 37 & Exhibit I.  In connection with their Motion for Modification of Prejudgment Remedy, they have submitted additional spreadsheets which cover delinquencies for the period from payroll month September 2011 up through payroll month May 2012.  Affidavit of Ellen Alch [Doc. 82-2] ¶ 9 & Attachment 2.[18]  No evidence or argument is currently before the court regarding attorney's fees, costs, or damages under 29 U.S.C. § 1132(g)(2)(C).

On or before September 11, 2012, the Funds shall file a current damages analysis, which shall include (1) a statement of the amount of the delinquency for the period from payroll month October 2009 to the date of the analysis, along with sworn evidence documenting that delinquency; (2) a statement of the amount of interest due on that delinquency with a full explanation of the calculation of that amount; (3) a statement of the amount of damages appropriate under 29 U.S.C. § 1132(g)(2)(C), with a full justification for that amount; and (4) a statement of the amount of attorney's fees and costs appropriate under 29 U.S.C. § 1132(g)(2)(D), with sworn documentation of the same which conforms to the requirements of *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983), *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994), and *Handschu v. Special Services Div.*, 727 F.Supp.2d 239, 249-51 (S.D.N.Y. 2010).

---

[18]  This affidavit is deficient in notarization.  Although a notary stamp is shown, the signature, name and commission expiration date of the notary are not provided.  *See* Conn. Gen. Stat. § 3-94k; *Lombardo v. United Techs. Corp.*, No. 3:95CV02353, 1997 WL 289669, at *3 (D.Conn. May 7, 1997).  The affidavit cannot be saved by being taken as a declaration under 28 U.S.C. § 1746, because it does not meet the requirements for such a declaration.

If they wish, the Employers may file a response to that damages analysis on or before September 25, 2012.  If they do, the Funds may file a reply to that response on or before October 2, 2012.


IV.     **Conclusion**

For the reasons stated above, the Employers' Motion for Summary Judgment [Doc. 65] is GRANTED as to the delinquency for the April 2009-September 2009 period, and DENIED in all other respects.  The Funds' Motion for Summary Judgment [Doc. 69] is GRANTED except with respect to the delinquency for the April 2009-September 2009 period.

On or before September 11, 2012, the Funds shall file a damages analysis as described in Part III of this Ruling.  If they wish, the Employers may file a response to that damages analysis on or before September 25, 2012.  If they do, the Funds may file a reply to that response on or before October 2, 2012.

Following the filing of the further submissions called for by this Ruling, the Court will determine the total amount of the Employers' present indebtedness to the Funds, and enter Judgment accordingly.  Given the recidivist nature of the Employers' erroneous calculations of amounts owing to the Funds, in disregard of judicial opinions and orders, the Court *sua sponte* raises the question whether the final Judgment should include a permanent injunction with respect to future, post-Judgment payments made pursuant to the current, 2011 CBAs.  Such an injunction, if granted by the Court, would subject the Employers to penalties for contempt in the event of noncompliance.  The Funds, if so advised, may include such an application in their next submission, and the Employers may respond in *their* next submission.

The Funds' Motion for Disclosure of Property and Assets [Doc. 81] and Motion for Modification of Prejudgment Remedy [Doc. 82] are DENIED as moot.


It is SO ORDERED.

Dated: New Haven, Connecticut
      August 21, 2012

                                    _/s/ Charles S. Haight, Jr._
                                    Charles S. Haight, Jr.
                                    Senior United States District Judge